**SOUTHERN PARKWAY CORPORATION and Theodore N. Lerner, Appellants,**

v.

**LAKEWOOD PARK CORPORATION, Appellee.**

**No. 15542.**

United States Court of Appeals District of Columbia Circuit.

Argued April 8, 1960.

Decided June 23, 1960.

Petition for Rehearing Denied July 19, 1960.

Mr. James E. Hogan, Washington, D. C., for appellants. Messrs. Arthur J. Hilland and Stanley Klavan, Washington, D. C., were on the brief for appellants.

Messrs. David G. Bress and Leonard Braman, Washington, D. C., for appellees.

Before PRETTYMAN, Chief Judge, and EDGERTON and WILBUR K. MILLER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

For the purpose of forming a subdivision near Fort Pierce, Florida, Lakewood Park Corporation divided certain acreage into thirteen units, divided each unit into blocks, and divided each block into lots. There were 3,900 lots in all. When only about 500 of the lots had been sold, Lakewood entered into a written contract with Southern Parkway Corporation dated October 22, 1956, by the terms of which Lakewood, as the seller, employed Southern as its exclusive agent—called broker—to sell in Maryland, Virginia and the District of Columbia. The following provisions appear in the contract:

"Whereas, the Broker is a duly licensed real estate broker, maintains an office in the District of Columbia, and is otherwise engaged in the sale of real estate in the States of Maryland, Virginia and the District of Columbia, and elsewhere; and

"Whereas, the Seller is the owner of tracts of land, and residences in various stages of construction, located in and known as Lakewood Park, a real estate subdivision of Ft. Pierce, Florida, said tracts of land to be subdivided into and sold as lots, or to be sold as lots with improvements thereon, in varying stages of construction, completed or to be completed; and

"Whereas, the Broker desires to sell the aforesaid land with improvements existing or to be built thereon and the Seller is desirous of engaging the services of said Broker for such purposes upon the terms and conditions hereinafter set forth,

"Now, Therefore, in consideration of the premises and of the mutual covenants, conditions and agreements herein contained and to be performed by the parties hereto, the said parties do hereby agree as follows:

"1. (a) The Seller does hereby irrevocably grant to the Broker the sole and exclusive right to sell the real estate described in unit and block numbers as from time to time to be furnished by Seller (a minimum, in any event, however, of 700 lots), all in said Lakewood Park Subdivision, Ft. Pierce, Florida. This exclusive agency does not apply to Seller in connection with sales made by Seller in Florida.

"This said exclusive right of sale shall begin upon the execution here-

of and shall terminate upon the sale of the last of said lots and/or improvements, or on April 30, 1958, whichever date shall first occur.

"(b) In the event the properties aforesaid are not sold prior to the expiration of the term aforesaid, then and in such event the Broker shall be deemed to have a general listing for the sale of said properties and this listing shall be subject to prior sale and increase in price."

The parties seem to agree that the season for selling such real estate in the Washington area begins with January and extends through March and perhaps into April. In January, 1957, Southern began selling under the contract. On June 12, 1957, when Lakewood had "furnished" 1,750 lots and at least 900 [1] of them had been sold by Southern, Lakewood wrote a letter [2] notifying Southern it was electing to terminate the latter's exclusive agency as of June 15, 1957. Thus it appears that, at the date of attempted termination, there were still listed with Southern from 650 to 850 of the 1,750 lots which had been furnished to it by Lakewood.

Lakewood claimed the right to terminate under its theory that, by the terms of the contract, the exclusive agency endured only until the minimum of 700 lots [3] had been sold by Southern, even though more than the minimum had been furnished for sale. Southern, on the other hand, contended the contract should be construed as meaning its exclusive agency lasted until April 30, 1958, unless before that date it had sold all lots which had been furnished for exclusive sale— not only the minimum of 700 lots, but also the lots which had been furnished in excess of that number.

1. This was Lakewood's figure. Southern claims to have sold 1,100 lots. At any rate, the parties agree that substantially more than 700 lots were sold. That 1,750 lots were furnished is Southern's estimate. Lakewood said in its complaint it had furnished "a number of lots substantially in excess of 1,000 * * *." For present purposes, the difference in the estimates of the number of lots furnished is immaterial.

2. The text of the letter is as follows:
   "On October 22, 1956, your corporation as broker entered into a contract with Lakewood Park Corporation as seller, whereunder you were irrevocably granted the sole and exclusive right to sell the real estate owned by it described in unit and block numbers as from time to time would be furnished by the seller, located in Lakewood Park Subdivision, Fort Pierce, Florida, (a minimum, in any event, of 700 lots,) and that contract further provides that your exclusive right of sale shall begin on the execution of that contract and shall terminate upon the sale of the last of said lots owned by it, or on April 30, 1958, whichever date shall first occur.
   "This is to advise you that as at the date hereof the Lakewood Park Corporation does not own more than four or five unsold lots in the Lakewood Park Subdivision. More than 700 lots having been sold under that contract, Lakewood Park Corporation hereby elects to terminate that contract with you for the sale of its lots in that subdivision, effective from and after the close of business, at 5:00 P.M. on Saturday, June 15, 1957.
   "To the extent that there may remain any unsold lots owned by Lakewood Park Corporation, we will see to it that you are properly credited with any commissions thereon to which you would become entitled.
   "From and after the effective date of the termination of this contract, you are respectfully requested to offer no more lots for sale under the said contract.
   "It will be appreciated if you will discontinue all activity of every nature whatsoever under the said contract of October 22, 1956, from and after 5:00 P.M. on Saturday, June 15, 1957, so that Lakewood Park Corporation may continue to completely manage all of its own affairs in connection with the subject matter covered by the said contract.
   "Appropriate steps will be inaugurated for a proper accounting between Southern Parkway Corporation and Lakewood Park Corporation arising out of said contract of October 22, 1956, and as promptly as a determination may be made with respect to the rights and obligations between the parties to that agreement, appropriate adjustment will be made."

3. See Section 1(a) of the contract, quoted earlier in this opinion.

In October, 1957, Lakewood filed a complaint against Southern, which was amended June 24, 1958, in which it sought a declaratory judgment affirming its right to terminate the contract, not only because it claimed the contract gave it that right after 700 lots had been sold by Southern, but also because it claimed Southern had not performed its obligations thereunder.

Without receiving evidence on or even reaching the contention that Southern's conduct had justified termination, the District Court held the contract gave Lakewood the right to terminate the exclusive agency at any time after Southern had sold 700 lots, and so gave Lakewood summary judgment. Southern appeals. So, we have before us only a question of law: by the terms of the contract, when did the exclusive agency terminate?

It should be noted that the contract does not expressly give to either party the right to terminate the exclusive agency by giving notice of its intention to do so. The contract fixes the date of termination: it provides the exclusive agency "shall terminate upon the sale of the last of said lots and/or improvements, or on April 30, 1958, whichever date shall first occur." Obviously if "the last of said lots and/or improvements" were sold before April 30, 1958, the exclusive agency would end. Difficulty has arisen because the parties disagree as to the meaning of the contractual words, "said lots and/or improvements."

Lakewood contends that the words, "said lots and/or improvements," in the second paragraph of Section 1(a) of the contract, refer to the parenthesized words of the first paragraph of Section 1(a): "(a minimum, in any event, however, of 700 lots)."[4] Lakewood is therefore arguing that the second paragraph

of Section 1(a) should be construed as though it read:

"This said exclusive right of sale shall begin upon the execution hereof and shall terminate upon the sale of the last of 700 lots, or on April 30, 1958, whichever date shall first occur."

Construing the termination clause in that fashion, Lakewood argues that the exclusive agency terminated when Southern had been furnished, and had sold, 700 lots; more than that number having been furnished to and sold by Southern prior to June 12, 1957, Lakewood says it had the contract right to give notice— as it did that day—of termination on June 15, 1957.

We do not agree that the parenthesized words, "(a minimum, in any event, however, of 700 lots)," in the first paragraph of Section 1(a), constitute the antecedent of the words, "said lots and/or improvements," in the second paragraph of the section.

We think the language we initially quoted from the contract shows that the phrase, "the real estate described in units and block numbers as from time to time to be furnished by Seller," in the first paragraph of Section 1(a), is the antecedent of the words, "said lots and/or improvements," in the second paragraph of the section. This construes the second paragraph of Section 1(a) as though it read:

"This said exclusive right of sale shall begin upon the execution hereof and shall terminate upon the sale of the last of the lots furnished by Seller (a minimum of 700 lots must be furnished), or on April 30, 1958, whichever date shall first occur."

The only function of the parenthetical expression, "(a minimum, in any event, however, of 700 lots)," was, we think, to

---

4. We note, however, that in the first paragraph of its letter of cancellation, footnote 2, in summarizing the contractual provision for termination of the exclusive agency, Lakewood said it would end on "the sale of the last of said lots owned by it, or on April 30, 1958, whichever date shall first occur." Thus it was reading the contract words, "the last of said lots and/or improvements," as meaning "the last of said lots owned by it." The second paragraph of the letter is inconsistent with this.

require that at least 700 lots be furnished by Lakewood to Southern for exclusive sale. Lakewood was not required to furnish more than that; but that it might do so is shown by the use of the word "minimum" and by the fact that it did furnish a greater number. So, when Lakewood furnished 1,750 lots—far in excess of the minimum—it more than met the parenthetical requirement that 700 be furnished; the result was that the minimum requirement no longer had significance or application for any purpose.

In other words, Lakewood could have stopped when it had furnished 700 lots, in which event the exclusive agency would have terminated when the last of them had been sold, no matter how long before April 30, 1958, that might have been. But Lakewood chose to furnish a greater number, so the exclusive agency continued until the last of them had been sold, or until April 30, 1958, if that date came before all furnished lots had been sold by Southern.

Lakewood also contends that the contractual words, "This exclusive agency does not apply to Seller in connection with sales made by Seller in Florida," and the contractual words, "from time to time," gave it the right to withdraw all lots above the 700 which had been furnished to but had not been sold by Southern. Thus Lakewood contends the June 12 notice of termination was tantamount to and should be construed as a withdrawal of all unsold lots which had been furnished; and that such complete withdrawal amounted to termination.

We cannot accept Lakewood's argument just summarized. The letter of June 12, 1957, did not purport to be a

withdrawal, for purpose of sale by Lakewood *in Florida*, of the 650 or more lots which then remained unsold by Southern of the 1,750 which had been furnished to it. It did not in terms purport to be a withdrawal at all. It was a bare notice of intention to terminate on June 15, 1957. But, as we have said, the contract did not provide for termination by either party; it provided for automatic termination upon the happening of a designated event or the arrival of a designated date, whichever might be earlier. From this it follows, we think, that Lakewood had the right to terminate only for cause, such as Southern's breach, for example. (We have seen that we are not here concerned with Lakewood's power to terminate for cause.)

Moreover, Lakewood's conduct after it gave notice of termination was inconsistent with the contention that the notice had had the effect of withdrawing for sale in Florida all lots it had furnished which had not been sold. For, the District Court was told by Lakewood's counsel that Lakewood intended to sell *in the Washington area*, after its notice of termination, the lots theretofore furnished to Southern which remained unsold on June 15, 1957;[5] and Southern's counsel told the District Court that Lakewood actually had made such sales.

We turn to a discussion of the effect, if any, of the following portion of Section 5 of the contract upon the question before us:

"If any of the purchasers, who were originally sold property by the Broker, buys an additional lot or lots, or house or houses through the Southern Parkway Corp., during the period ending April 30, 1958, said

5. Lakewood's counsel said to the District Court:

"* * * There was a threat of litigation but no suit had been filed by them and we then went into court in order to seek the aid of the court, the jurisdiction of the court, in view of the fact that Lakewood Park was going to operate its own business in Washington in the 1958 selling season.

"The Court: What do you mean by 'its own business'?

"Mr. Bress: It was going to do its own selling as owner—not use any independent agent.

"The Court: Of the property owned by plaintiff?

"Mr. Bress: Of the property owned by the plaintiff."

Corporation will receive fifteen percent (15%) of the sales price."

Lakewood vigorously contends the sentence just quoted supports its position that the exclusive agency terminated when the 700th lot was sold, and refutes Southern's position that the exclusive agency lasted until it had sold the last of 1,750 lots furnished, or until April 30, 1958, whichever was earlier. Lakewood says:

" * * * In other words, circumstances might arise prior to April 30, 1958, where Lakewood or some broker other than Southern would be permitted to sell, concurrently with Southern, in its own jurisdiction. This could not occur if Southern's agency was still exclusive. It could occur only if 700 lots were sold prior to April 30, 1958, and Southern's exclusive was thereby terminated, leaving it with a general agency as to remaining lots listed with it."

We disagree. We think "it could occur" if the 1,750 lots furnished by Lakewood were sold by Southern prior to April 30, 1958, thus terminating Southern's exclusive agency and leaving it with a general agency as to the unsold portion of the subdivision, "subject to prior sale and increase in price."

We think it unnecessary to determine whether Section 5 has any meaning or what its meaning is, or to speculate as to why the parties included it in the contract. Whatever its purpose, we find nothing in Section 5 which is inconsistent with or militates against our construction of the crucial language of Section 1(a)—a construction which controls this case.

In sum, we hold the exclusive agency terminated by the terms of the contract on April 30, 1958, or on any earlier date on which Southern had sold the last of the 1,750 lots which had been furnished to it. Consequently, the District Court erred in holding the exclusive agency ended when the 700th lot had been sold by Southern.

Reversed.